# EXHIBIT A

COMMERCIAL LEASE

THIS LEASE is made as of this ___1ˢᵗ___ day of _March_, 20_11_, by and between The University of Maryland Medical System and The University of Maryland Medical Center (collectively, "Landlord"), and ABP Corporation ("Tenant").

1.    FUNDAMENTAL LEASE PROVISIONS

    1.1    In General. This Article 1 is an integral part of this Lease and all of the terms, dates and requirements set forth in this Article 1 are incorporated in this Lease in all respects. In addition to the other provisions which are elsewhere defined in this Lease, the following terms, whenever used in this Lease, shall have the meanings set forth in this Article 1.

    1.2    Premises. Approximately 2,353 square feet of retail space in the Homer Gudelsky Tower (primary unit) and approximately 1,495 square feet of production and retail space in the lobby of the Paca-Pratt Building (subject to re-measurement as provided herein), as shown by cross-hatching on Exhibit B.

Store Addresses:  22 South Green Street, Baltimore, Md. 21201

110 South Paca Street, Baltimore, Md. 21201

    1.3    Term.

| | |
|---|---|
| Initial Term: | Ten (10) Lease Years (subject to Section 3.1) |
| Option Terms: | Two (2) additional five (5) year period(s). |
| Scheduled Delivery Date: | Landlord shall deliver possession of the Premises to Tenant no earlier than seven (7) days nor later than thirty (30) days after Tenant provides notice to Landlord that it has received it permits to construct the Premises.  The estimated delivery date is March 1, 2011. |

    1.4    Base Rent.

| | |
|---|---|
| Lease Years 1 through 5: | Two Hundred Seventy Five Thousand Dollars ($275,000.00) Per Year; Twenty Two Thousand Nine Hundred Sixteen and 67/100 Dollars ($22,916.67) per month |

| | |
|---|---|
| Lease Years 6 through 10: | Three Hundred Two Thousand Five Hundred Dollars ($302,500.00) per Year; Twenty Five Thousand Two Hundred Eight and 33/100 ($25,208.33) per month |
| Option Term: Lease Years 11 through 15: | Three Hundred Thirty Two Thousand Seven Hundred Fifty Dollars ($332,750.00) Per Year; Twenty Seven Thousand Seven Hundred Twenty Nine and 17/100 Dollars ($27,729.17) per month. |
| Option Term: Lease Years 16 through 20: | Three Hundred Sixty Six Thousand Twenty Five Dollars ($366,025.00) Per Year; Thirty Thousand Five Hundred Two and 08/100 Dollars ($30,502.08) per month. |

1.5   Percentage Rent Rate. Ten Percent (10%) .

1.6   Intentionally Deleted

1.7   Intentionally Deleted.

1.8   Addresses For Notices.

To Landlord:
University of Maryland Medical System, Inc.
Corporate Contracts PP 07-034____
22 S. Greene Street
Baltimore, MD. 21201

University of Maryland Medical Center
110 S Paca Street
Room 8S-133
Baltimore, MD. 21201


To Tenant:
ABP Corporation
One Au Bon Pain Way
Boston, MA. 02210
Attn:  Vice President-Real Estate

with a simultaneous copy to:
ABP Corporation
One Au Bon Pain Way
Boston, MA 02210
Attn:  General Counsel

1.9     Hospital. The Premises, the Building, and the other buildings and property owned by Landlord, commonly known as the University of Maryland Medical Center.

1.10    Property. The real property containing the Hospital, which Hospital is described on Exhibit A.

1.11    Building. The building or buildings containing the Premises.

2.      PREMISES AND LANDLORD'S WORK

2.1     Premises. Landlord hereby leases to Tenant and Tenant hereby rents from Landlord the Premises, in consideration of, and upon the terms and conditions contained in this Lease.  Promptly following acceptance of the Premises by Tenant, the parties shall measure the floor area of the Premises.  The floor area of the Premises shall be determined by measuring from the outside of exterior walls to the center of any demising walls.  If the floor area as measured by the parties is less than the area set forth in this Lease, the Base Rent shall be adjusted accordingly.

2.2     Landlord's Work. Landlord has, or as of the Commencement Date shall have, constructed the buildings and parking and other Common Areas as shown on Exhibit B. Landlord shall, at Landlord's sole cost and expense, construct the Premises in accordance with Landlord's Work under the provisions of Exhibits C and C-1 ("Landlord's Work"). To the best of Landlord's knowledge, upon delivery of the Premises to Tenant the Premises will be in sound condition, in compliance with all applicable federal, state and local codes, and the structural elements, roof and Building systems will be seismically and otherwise sound and will meet all applicable federal, state and local codes, including but not limited to disabled accessibility standards and any local requirements (such as upkeep of grease traps).  The Premises shall be delivered free of all leaks.  Further, during the term of this Lease, Landlord shall, at Landlord's expense, comply with all federal, state, county and municipal laws and ordinances and all rules, regulations and orders of any duly constituted governmental authority, including without limitation, any handicapped accessibility laws and/or present or future governmental orders having jurisdiction thereof, with regard to the Hospital, the structural aspects of the Premises, or that pertain to retail or restaurant stores generally (as opposed to Tenant's specific food and beverage use only).  In addition, notwithstanding the foregoing, Landlord shall deliver the Premises located in the Paca Pratt building to Tenant with the items set forth on Exhibit C-4.  Tenant shall return the Premises to Landlord at the end of the Term with such items, other than the water filter and 1 bay sink, which will be utilized by Tenant only for its temporary operations at the property and then disposed of during Tenant's demolition phase.

2.3     Delay in Landlord's Work. Landlord shall deliver possession of the Premises to Tenant, in the condition required hereunder, by the Scheduled Delivery Date, and Tenant shall execute Exhibit C-2 attached hereto.   If Landlord has not completed Landlord's Work in accordance with Exhibits C and C-1 and delivered possession of the Premises to Tenant prior to the Scheduled Delivery Date (subject

3

only to minor punch list items), then Tenant may, at its option, accept possession of the Premises on the Scheduled Delivery Date and complete the incomplete portions of Landlord's Work, and charge Landlord for the reasonable cost thereof. If Landlord does not pay such amount within thirty (30) days after notice from Tenant, then Tenant may deduct such amount from Base Rent hereunder.

Further, if the Premises are not completed and delivered to Tenant in the condition required hereunder within one hundred fifty (150) days after the Scheduled Delivery Date for any reason whatsoever (excluding force majeure), then Tenant may terminate this Lease. If Tenant elects to terminate this Lease, Landlord shall reimburse Tenant for all of Tenant's expenses incurred in connection with this Lease, including, without limitation, site selection and lease negotiation costs and expenses (including the allocated cost of in-house personnel), up to a maximum of Fifty Thousand Dollars ($50,000.00). Landlord shall also return all monies previously deposited by Tenant, if any.

3.   TERM

3.1   Initial Term. The Initial Term of this Lease shall be of the duration set forth in Article 1 hereof and shall commence on the earlier of the following dates in (a) or (b) below, ("Commencement Date"), and shall terminate on the last day of the month in which the tenth (10th) anniversary of the Commencement Date occurs, unless extended or sooner terminated as set forth in this Lease:

(a)   The date on which Tenant opens for business in the Premises; or

(b)   The date which is one hundred twenty (120) days after the date that (i) Landlord's architect certifies to Tenant in writing that the Premises have been substantially completed with respect to "Landlord's Work" (as that term is more specifically defined in Exhibits C and C-1); (ii) a certificate of occupancy or other final approval with respect to Landlord's Work under Exhibits C and C-1 has been issued or granted to Landlord by the authority which issued the building permit; (iii) the Hospital, including (without limitation) any Common Areas, are in the condition required under this Lease and are substantially completed; (iv) permanent power is available to the Premises; (v) Landlord has provided Tenant with a fully executed copy of the Lease; (vi) Tenant has received Landlord's approval of Tenant's plans (if such approval is required under the Lease); (vii) Tenant has received all permits or approvals required for Tenant's construction and/or conduct of Tenant's business in the Premises so long as Tenant pursues acquisition thereof with due diligence; and (viii) Landlord has delivered actual possession of the Premises to Tenant, which delivery must be preceded by a notice of a delivery date received by Tenant at least ten (10) days prior thereto. In no event, however, shall Tenant be required to accept possession of the Premises prior to the Scheduled Delivery Date. Promptly after the Commencement Date, Landlord and Tenant shall execute a memorandum stating the actual Commencement Date and Expiration Date.

3.2   <u>Option Terms</u>.  Tenant is hereby granted two (2) options to extend the Initial Term of this Lease as set forth in Article 1 hereof, by giving to Landlord written notice of its exercise of each such option at least ninety (90) days before the expiration of the Initial Term, or prior Option Term, as the case may be.  The Option Terms shall be upon the same terms, covenants, conditions, provisions and agreements applicable to the Initial Term, except that Tenant shall pay to Landlord the Base Rent during such Option Terms as set forth in Article 1 under Option Term Rent.

4.   EARLY TERMINATION RIGHT.

Notwithstanding anything contained herein to the contrary, Tenant, in its sole discretion, shall have the right to terminate the Lease any time on or after the last day of the fifth (5th) full Lease Year (the "Early Termination Date").  In order to exercise this early termination right, Tenant must give Landlord written notice at least one hundred twenty (120) days before the Early Termination Date.  Upon the date Tenant specifies for such early termination, Tenant shall be fully and forever released and discharged from any and all obligations, covenants or liabilities of whatsoever kind or nature in law or equity or otherwise arising out of or in connection with the Lease or any other agreements by and between Landlord and Tenant except any obligation or liability accrued before the Early Termination Date.

5.   PERMIT CONTINGENCY.

Tenant's obligations under this Lease are conditioned on Tenant's obtaining, by the date which is sixty (60) days after Tenant files for such permits with the applicable authorities, any permits, approvals and/or licenses (including but not limited to conditional use permits, building permits and variances) that are required by applicable laws to enable Tenant legally (a) to construct Tenant's improvements to the Premises in accordance with its plans; (b) to install Tenant's signage on the Premises; and (c) to conduct its business from the Premises.  Tenant shall, at Tenant's expense, initiate and diligently pursue each permit and/or license. Tenant shall file for such permits within five (5) days after receipt of approval from Landlord of Tenant's final plans hereunder. Landlord shall execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such permits and/or licenses.  If Tenant does not obtain such permits and/or licenses on terms satisfactory to Tenant by such time frame, Tenant shall give Landlord written notice thereof, and Landlord may elect, by giving written notice to Tenant within seven (7) days thereafter, that Landlord will attempt to obtain the permits on Tenant's behalf at Landlord's cost. If Landlord does not elect to pursue the permits, or fails to timely notify Tenant of its election to pursue same, Tenant shall have the right to terminate this Lease.  If Landlord elects to attempt to obtain such permits, but fails to obtain such permits within sixty (60) days thereafter, Tenant shall have the right to terminate this Lease.  Thereafter, neither party shall have any rights or liabilities under the Lease. Notwithstanding anything contained herein to the contrary, Landlord shall promptly cure, at its sole cost and expense, any violations at the Premises, Building or Property, not caused by Tenant, which prevent Tenant from obtaining any of its permits hereunder.  The sixty (60) day period set forth above for Tenant to obtain its permits

shall be tolled for each day of delay to Tenant caused by Landlord curing or attempting to cure any such violations.

6.    RENTAL

6.1    Types of Rental.  Tenant covenants and agrees to pay to Landlord the following rental, at the times and in the manner hereinafter provided, the following sums:

(a)    Base Rent as set forth in Article 1 hereof, payable in twelve (12) equal monthly installments, in advance, on the first day of each calendar month during each year of the term of the Lease.  If the Commencement Date of the term hereof occurs on a day other than the first day of the month, the monthly installment of Base Rent for the fraction of the month starting with the Commencement Date shall be prorated on the basis of the actual number of days in such month;

(b)    For each Lease Year, percentage rent equal to ten percent (10%) of Gross Sales in excess of Three Million Five Hundred Thousand Dollars ($3,500,000.00) in each Lease Year ("Percentage Rent").  Percentage Rent shall be computed and payable annually, within ninety (90) days after the end of each Lease Year, and shall be accompanied by a statement indicating the amount of Tenant's Gross Sales for such Lease Year.

Except as set forth above, Tenant shall pay no other charges to Landlord.

6.2    Confidentiality.  Landlord agrees not to divulge to any person or persons, governmental agency, firm or corporation, the amount of Gross Sales made by Tenant from the Premises or the rental or other charges paid by Tenant pursuant to this Lease, except that Landlord shall be entitled to reveal such information to lenders, bona fide purchasers and/or as may otherwise be required by law.

6.3    Gross Sales Defined.  "Gross Sales" is defined as the selling price of all items, merchandise or services sold in or from the Premises by Tenant, its subtenants, licensees and concessionaires, whether for cash or for credit, excluding, however, the following:  (a) The selling price of all merchandise returned by customers and accepted for full credit or the amount of discounts and allowances made thereon; (b) Sums and credits received in the settlement of claims for loss of or damage to merchandise; (c) delivery charges; (d) Cash refunds made to customers in the ordinary course of business; (e) Interest, service or sales carrying charges or other charges, however denominated, paid by customers for extension of credit on sales and where not included in the merchandise sales price, as well as charges or expenses in connection with credit cards or bank cards whether paid by the customer or by Tenant; (f) Receipts from mechanical vending machines located in employee areas, and Internet or catalogue sales; (g) Gift certificates or like vouchers and all deposits by purchasers, unless and until such time as the same have been converted into a sale at the Premises; (h) Any sale of substantially all of the assets of Tenant in bulk and not in the normal course of business; (i) Sales to employees; (j) Sales of fixtures, machinery, and

equipment which are not stock in trade; (k) Deductions for bad debts actually charged against sales from the store or a reasonable allowance therefor based on actual experience; (l) Items purchased at no profit, including (without limitation) promotional items; (m) Sales or value added taxes; (n) catering sales; (o) sales of goods produced at the Premises for sale and consumption at an off site location; and (p) insurance proceeds.

6.4     <u>Recordkeeping</u>.  Tenant agrees that it shall keep for three (3) years, at its national headquarters (or such other place as Tenant may designate), accurate records in the computer medium then used by Tenant showing Tenant's Gross Sales, and Tenant shall produce computer-generated reports based on such records in accordance with the reporting requirements of this Lease.  Landlord may, upon fifteen (15) days notice, audit Tenant's records of Gross Sales from the Premises for the preceding three (3) years.

6.5     <u>Lease Year Defined</u>.  For the purpose of this Lease, subject to the two additional provisions set forth below in this Section 6.5, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12) consecutive calendar months during the Term.  If the Term commences on a day other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding twelve (12) full calendar months shall constitute the first Lease Year of the Term.  If the last day of the first Lease Year falls between September 1 and January 31, then the first Lease Year shall be extended to end on the last day in February and each subsequent Lease Year shall begin on March 1.

7.     USE OF PREMISES

7.1     <u>Use</u>.  Tenant shall use the Premises as a cafe including, at Tenant's discretion, the retail sale of (a) assorted food items including but not limited to baked goods, desserts, frozen desserts, salads, sandwiches, soups, hot dishes, juices, candies and novelties, (b) whole and ground coffee beans, (c) espresso/coffee/tea-based drinks, (d) espresso/coffee/tea related equipment, supplies and accessories, (e) seasonal, promotional and Tenant branded merchandise, (f) non-food items not presently restricted by the written exclusive use rights of other tenants at the Property, and (g) other items that Tenant or its successors make available for sale in the ordinary course of business and consistent with other Au Bon Pain stores in the Maryland/DC/Virginia region, not presently prohibited by the exclusive use rights of other tenants at the Property. Attached hereto as Exhibit D is a list of current exclusives at the Property. The Paca-Pratt location shall also be used for production by Tenant.

Landlord represents and warrants that to the best of its knowledge as of the date of this Lease, the use of the Premises for the Permitted Use is not prohibited by any applicable zoning law or ordinance applicable to the Building and the Premises.

Landlord is generally familiar with the nature of Tenant's other stores and the permitted use to be conducted by Tenant on the Premises and Landlord agrees that odors consistent with the ordinary conduct of the permitted use on the Premises shall not be deemed to be unusual or objectionable. Tenant may use a loudspeaker at reasonable decibel levels to announce orders in the Premises, and may play music in the Premises and Patio Area provided that such music is played at a reasonable level and does not negatively impact guest, patient, staff or visitor satisfaction. Landlord shall have approval rights over the level of volume for such music. Tenant, and its agents, employees and customers shall have the non-exclusive right to use all portions of the Common Area.

7.2    Exclusive Use.  Landlord will not operate or permit any party, other than Tenant, to operate on the Property as a bakery/cafe. Any existing tenant whose lease allows it to operate as a bakery/café shall not be subject to Tenant's exclusive. Landlord agrees that, to the extent that it has reasonable control over such tenant's use and changes in use, it shall exercise such control to enforce Tenant's exclusive. For purposes hereof, the term bakery/café shall mean a fast casual restaurant without table service selling substantially similar core items as Tenant of baked goods, bread, bakery desserts, salad, sandwiches and soups. Further, Landlord shall in no event permit any food vendors within three hundred (300) feet of the Premises, other than with respect to those vendors in operation as of the date of the Lease. Prior to adding any additional food use at the Property (subject to the restrictions above), Landlord shall meet with Tenant to coordinate the addition of same and allow Tenant to provide feedback on the addition of any such use. Notwithstanding the foregoing, the two spaces proximate to the cafeteria (currently occupied by Starbucks and Cypriana Café concepts, respectively) shall not be subject to the provisions of this exclusive.

7.3          Operations.  Tenant will operate the primary unit seven (7) days per week and twenty-four (24) hours per day, except that for the first week of operations at the main unit, Tenant shall not be required to operate longer than 6:00 a.m.-midnight. Tenant will have the right to close the primary unit between the hours of 12:00am and 6:00am on Saturdays, Sundays and/or Mondays (meaning 12:00 a.m.-6:00 a.m. following 11:59 p.m. on Fridays, Saturdays and Sundays) if sales during those hours fall below $1,000 for three consecutive weeks. After a period of closure for 6 months, Landlord may request that Tenant reopen during such hours, with the right to again close the primary unit between the hours of 12:00am and 6:00am on Saturdays, Sundays and/or Mondays if sales during those hours fall below $1,000 for three consecutive weeks. Tenant will operate the Paca-Pratt retail kiosk Monday through Friday between the hours of 7:00am and 5:00pm, with the right to extend such hours to 6:00 a.m. to 6:00 p.m. in Tenant's discretion.  Tenant will have 24-hour access to both units.

7.4          Health Department Compliance. All "Health Department" (the local government body having jurisdiction) regulations with regard to food safety, sanitation and inspection shall remain in compliance during the term of this agreement and as such will be the responsibility of the Tenant.

7.5     UMMC C2X Coupons. Tenant agrees to accept C2X Reward & Recognition and Service Recovery Coupons as payment for food items from both locations as part of this agreement. Tenant will collect coupons and submit them to the Division of Hospitality Services for reimbursement by the Landlord on a monthly basis, and Landlord shall reimburse Tenant for full amount of such coupons within thirty (30) days of receipt of same. Tenant shall not be required to give any change to customers using the C2X coupons. Under no circumstances shall such C2X Coupons be reimbursed by Landlord to Tenant if they are presented for reimbursement more than 12 months after use by patrons. Tenant shall be responsible for declining any C2X Coupons that are presented by patrons more than 12 months after the issuance date if such date is indicated on the C2X Coupon.

7.6     QUALITY CONTROLS.  Landlord acknowledges that the Premises reside within Landlord's Hospital and its use and occupancy thereof is desired by Landlord in order to enhance the availability and quality of food services to Hospital patients, their families, visitors and staff.  To that end, the parties agree that Tenant shall maintain the following "Quality Standards" in its operations at the Premises.

(a)     Tenant shall operate in the Premises in a top-quality manner consistent with its corporate standards (the "ABP Standards").  Tenant shall conduct operational audits ("QSC Audit") on a quarterly basis and provide copies of same to Landlord.

(b)     Tenant shall offer a wide selection of food and beverage items, consistent with its menu offerings at its other operations.

(c)     The Premises shall be decorated in an attractive manner, consistent with ABP standards.  Tenant shall display all food and beverage items in a neat and orderly fashion. Aisles, tables, counters and appurtenant floor space shall be regularly swept and cleaned and kept free of debris and clutter during hours of operation.

(d)     Tenant shall employ an adequate number of qualified, trained staff to provide service at the Premises.  Tenant's employees shall (i) provide courteous, prompt and efficient service to all customers, (ii) maintain a presentable appearance and (iii) at all times conduct themselves in a professional manner.

(e)     Tenant's on-site and corporate management shall be available to meet with Landlord on a quarterly basis, upon Tenant's request, to review Tenant's compliance with the Quality Standards, address any other concerns and discuss any proposed operational changes or

enhancements, including promotional events or offerings, provided that any such changes shall be subject to the reasonable approval of Tenant.

(f)     In the event that Landlord has any issues or concerns surrounding the Quality Standards, Landlord shall contact the general manager of the Premises, who is currently Prince Ngom (prince_ngom@aubonpain.com). In the event that Landlord's concerns are not reasonably addressed in a prompt manner, Landlord shall have the right to escalate its concerns to the Area Director, who is currently Chris Cutler (chris_cutler@aubonpain.com), and thereafter to the Regional Vice President who is currently Peter Guidry (peter_guidry@aubonpain.com).

8.     REPAIR AND MAINTENANCE

8.1     Tenant's Responsibility. Tenant shall, at its sole cost and expense, maintain the interior, non-structural portions of the Premises and the plate glass and storefront thereof, in a first-class condition, reasonable wear and tear, damage by casualty, and condemnation excepted. Tenant shall also maintain all wiring, plumbing, pipes, conduits and other utilities which are located in and exclusively service the Premises. Upon Tenant's request to Landlord, Landlord will supply to Tenant, or enforce for Tenant's benefit, all available warranties by subcontractors, suppliers, manufacturers and materialmen for construction of that portion of the Premises which is Landlord's responsibility. Notwithstanding anything contained to the contrary herein, in no event shall Tenant have any obligation to repair any damage or defects caused by the acts or omissions of Landlord or its agents or contractors. If Tenant fails to undertake to repair or maintain the Premises as required pursuant to this Lease after thirty (30) days notice to Tenant (or such longer period as is reasonably required for such repair or maintenance), then Landlord may, at its option, perform such repairs or maintenance and charge Tenant for the reasonable cost thereof.

8.2     Landlord's Responsibility. Except for maintenance that Tenant is required to perform pursuant to the preceding subsection, Landlord shall, at its sole cost and expense, maintain, repair and replace all other portions of the Premises and the Hospital so as to keep them in a first-class condition. This includes, but is not limited to, the maintenance, repair, and replacement of the foundation, roof, roof membrane, exterior walls and structural elements of the Premises and the Hospital, the fire safety sprinkler system, gutters and downspouts and all wiring, plumbing, pipes, conduits and other utilities that are not located on the Premises or do not exclusively service the Premises. Landlord shall also maintain all Common Areas in first-class condition, repair and cleanliness, including ice, snow, water, mud and debris removal, and free of any impediments to easy and safe movement, including having such Common Areas well-lighted during all business hours. Landlord's maintenance, repairs and replacements hereunder shall comply with all federal, state, county and municipal laws and ordinances and all rules, regulations and orders of duly constituted governmental authority having jurisdiction thereof. In the case of an emergency, if Landlord fails to

immediately undertake to repair or maintain the Premises or Common Areas as required pursuant to this Lease after notice as is reasonable under the circumstances (but in no event more than thirty (30) days) from Tenant, Tenant may perform such reasonable emergency repairs or maintenance necessary and deduct the reasonable cost thereof from the rentals next falling due hereunder, until the entire amount is absorbed, in addition to any other remedies Tenant may have hereunder or at law or in equity.

8.3     Tenant Alterations.  Tenant may make non-structural alterations or improvements to the interior of the Premises, in a good and workmanlike manner, and in conformity with all laws, ordinances and regulations of public authorities having jurisdiction over the Hospital, without Landlord's prior consent, provided that such changes are consistent with the design of other Au Bon Pain stores in the Maryland/DC/Virginia region.  Except as otherwise expressly provided herein, if at all, Tenant shall not make any alterations to the structural or exterior portions of the Premises or to any building-wide systems without first obtaining the written consent of Landlord, which shall not be unreasonably withheld.

8.4     Tenant's Liens.  Tenant shall pay or cause to be paid prior to delinquency all costs for work done by it or caused to be done by it on the Premises and Tenant will keep the Premises free and clear of all mechanics' liens and other liens on account of work done by or for Tenant relating thereto.  Tenant shall hold Landlord harmless from and indemnify and defend Landlord against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) on work performed for or materials or supplies furnished to Tenant, which relate to the Premises.  If Tenant shall desire to contest any claim of lien, it shall furnish Landlord reasonable security of the value or amount of the lien, plus estimated costs and interest.  If a final judgment establishing the validity or existence of a lien for any amount is entered by any court of competent jurisdiction, Tenant shall pay and satisfy the same at once.

9.      INSURANCE

9.1     Tenant's Insurance.  During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance.  Any insurance policy required of Tenant may be maintained by means of a policy or policies of blanket insurance, covering additional items or locations, and any such policy may provide for such deductible limits as Tenant deems appropriate.  Such insurance may also be primary, excess and/or umbrella insurance.

(a)     Liability Insurance.  Liability insurance insuring against claims for bodily injury, personal injury or property damage arising out of or in connection with Tenant's use upon, in or about the Premises in a limit of not less than Two Million Dollars ($2,000,000.00) per occurrence.  Tenant shall maintain umbrella liability coverage in amounts not less than Three Million Dollars ($3,000,000.00) per occurrence. Tenant's insurance shall be primary with respect to claims arising out of events occurring in the Premises.

(b)     <u>Property Insurance</u>.  Commercial property form insurance to the extent of at least eighty percent (80%) of the insurable value of Tenant's trade fixtures, equipment and inventory in the Premises.  Tenant may self-insure plate glass.

9.2     <u>Landlord's Insurance</u>.  During the Term of this Lease, Landlord shall obtain and keep in full force and effect, the following insurance.  The insurance required to be carried by Landlord under this Section shall be referred to herein as "Landlord's Insurance."

(a)     <u>Liability Insurance</u>.  Liability insurance insuring against claims for bodily injury, personal injury or property damage arising out of or in connection with (a) Landlord's activities upon, in or about the Premises; or (b) the use or occupancy of the Building/Hospital in a limit of not less than  One Million Dollars ($1,000,000.00) per occurrence and Two Million Dollars ($2,000,000.00) annual aggregate.  Landlord's Insurance shall be primary with respect to any claim arising out of events that occur outside the Premises. General Liability coverage provided through the program of self-insurance administered by the Maryland Medicine Comprehensive Insurance Company shall be acceptable.

(b)     <u>Property Insurance</u>.  Commercial property form insurance insuring the Building/Hospital (excluding any property which Tenant is obligated to insure under Section 9.1 (b)), against damage and destruction by fire, vandalism, and other perils in the amount of the full replacement value of the Building/Hospital, as such value may exist from time to time.  Tenant shall not be required to obtain or reimburse Landlord for earthquake, terrorism, or flood insurance.

9.3.     <u>Evidence of Insurance; Standards</u>.  Landlord and Tenant each agree to deliver to the other certificates of insurance or self-insurance evidencing the existence in force of the coverages described in this Article 7.  All of the policies of commercial insurance required to be maintained hereunder shall be issued by an insurer licensed to do business within the state in which the Premises are located, which insurer rating and financial strength of not less than A-(X) or better in Best's Insurance Reports.

9.4     <u>Mutual Waiver of Subrogation</u>.  Neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence or other conduct of such party, its agents or employees if any such loss or damage is covered by insurance benefitting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease.  Landlord and Tenant shall require their respective insurance companies to include a standard waiver of subrogation provision in their respective policies.

9.5     <u>Tenant Indemnity</u>.  Tenant shall defend, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits,

actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Premises; (b) any intentional misconduct, or negligence of Tenant or Tenant's agents, employees, or contractors; (c) any breach or default in the performance of any obligation on Tenant's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Tenant herein to be true when made. This indemnity does not extend to the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

     9.6    <u>Landlord Indemnity</u>. Landlord shall defend, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Common Areas or any other portion of the Building/Hospital outside the Premises; (b) any intentional misconduct, or negligence of Landlord or Landlord's agents, employees, or independent contractors; (c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Landlord herein to be true when made. This indemnity does not extend to the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of the Lease.

10.    HAZARDOUS MATERIALS

     10.1    <u>Definitions</u>. As used herein, the term "Hazardous Materials" means any chemical, substance, material, object, condition or waste, or combination thereof, which (a) is defined as a hazardous substance, hazardous material, hazardous waste, pollutant, toxic material or contaminant under any Environmental Law, including but not limited to mold, biotoxins and radon, (b) is a petroleum hydrocarbon, including crude oil or any fraction thereof, (c) may be hazardous to human health or safety of the environment due to its harmful or potentially harmful properties or effects, including, toxicity, corrosivity, flammability, explosivity, infectiousness, radioactivity, carcinogenicity or reproductive toxicity, (d) is regulated pursuant to any Environmental Law, and/or (d) is asbestos or asbestos-containing material ("ACM"). As used herein, the term "Environmental Law" means any federal, state or local environmental, health and/or safety related law, regulation, standard, court decision, ordinance, rule, code, judicial or administrative order or decree, directive, guideline, permit or permit condition relating to Hazardous Material.

     10.2    <u>Landlord Representation</u>. To the best of Landlord's knowledge but excepted in the following environmental reports or documents provided to Tenant by Landlord: Environmental Summary dated February 23, 2011 prepared by John Baldwin, Chief Engineer-Facilities Department, University of Maryland Medical Center, no

Hazardous Material has been used, generated, manufactured, produced, stored, released, discharged or disposed of on, under or about the Property, the Building, the Property, or the Hospital (or off-site of the Property that might affect the Premises) or transported to or from the Premises, the Building, the Property or the Hospital (or off-site of the Premises that might affect the Premises) by any entity, firm or person, or from any source whatsoever.

10.3    Landlord Remediation.  Notwithstanding any other provision in this Lease, in the event that any investigation, removal, remediation, clean-up or other action in connection with Hazardous Materials is required by any Environmental Law applicable to the Premises or the Hospital, during the term of this Lease, Landlord shall be responsible for promptly performing such required investigation, removal, remediation, clean-up or other action at Landlord's sole expense in accordance with applicable Environmental Laws; provided, however, that if and to the extent such Hazardous Material was deposited by Tenant or Tenant's agents, employees, or contractors, then Tenant shall be responsible to reimburse Landlord for all reasonable costs incurred in such investigation, removal, remediation, and clean-up.  Without limiting any provision of this Lease, Landlord agrees to remove at Landlord's sole cost any and all Hazardous Materials, including ACM from the Premises prior to the delivery of the Premises by Landlord, and such removal shall be deemed to be a part of Landlord's Work.  If any ACM is discovered in the Premises during Tenant's construction, Landlord shall remove same and the Commencement Date shall be delayed one day for each day of delay caused thereby.

10.4    Landlord Reimbursement.  Landlord hereby agrees to reimburse Tenant for all reasonable costs (including, without limitation, attorneys' fees) which arise out of the presence of any Hazardous Materials deposited by Landlord in, on, under or about the Premises or the Hospital.  This reimbursement provision shall survive termination of this Lease.

10.5    Tenant Reimbursement.  Tenant hereby agrees to reimburse Landlord for all reasonable costs (including, without limitation, attorneys' fees) which arise out of the presence of any Hazardous Materials deposited by Tenant in, on, under or about the Premises or the Hospital.  This reimbursement provision shall survive termination of this Lease.

10.6    Landlord Indemnity.  Landlord hereby agrees to indemnify, defend and hold harmless Tenant, its officers, directors, employees, agents and each of their respective successors and their assigns from and against any and all losses, damages, claims, judgments, liabilities, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees) which arise out of the presence or suspected presence of any Hazardous Materials not brought onto the Building or Hospital by Tenant.  This indemnity shall survive termination of this Lease.

10.7    Subject to Tenant's obligations set forth in Section 10.5, if any Hazardous Substance is deposited, released, stored, disposed, discovered or present in or on the Premises, the Building/Hospital or the Property, Landlord, at Landlord's expense, shall

promptly and diligently, to the extent required by any applicable law, including (without limitation) any Environmental Laws, rules, regulations and policies of any governmental entity with jurisdiction over the same, and in compliance with such laws, remove, transport and dispose of such Hazardous Substance. Landlord shall use its best efforts to minimize direct and indirect impact on Tenant, including its operations in the Premises and effective use of the Common Areas, if any, during all activities related to remediation. Without limiting the foregoing, prior to the Commencement Date, Landlord shall, at its sole cost and expense, remove all asbestos and asbestos-containing material from the Premises. If any asbestos or asbestos-containing material is discovered in the Premises during Tenant's inspection of the Premises, construction of its initial or subsequent tenant improvements or at any other time during the Term, then Landlord shall promptly remove the same or cause it to be removed at Landlord's sole cost and expense and if the foregoing delays the construction or installation of Tenant's improvements, then the Rent Commencement Date shall be extended for one (1) day for each day of delay.

10.8   Tenant shall be entitled to use limited quantities of cleaning solvents and other similar products that could constitute Hazardous Materials so long as Tenant uses such items in quantities and in amounts consistent with industry custom and in compliance with applicable law.

11.   DAMAGE AND DESTRUCTION

11.1   Termination of Lease.  Notwithstanding anything to the contrary contained in this Lease, in the event of damage or destruction to the Premises or the Building, Tenant and Landlord shall each have the right to terminate this Lease under the following conditions:  (a) the damage renders the Premises insufficient for Tenant's use in Tenant's reasonable business judgment; (b) the damage is such that the Premises cannot reasonably be expected by Tenant to be (or are not) restored within one hundred eighty (180) days from the date of damage; (c) the damage or destruction is caused by a peril not required to be insured against hereunder; or (d) the damage or destruction occurs during the last two (2) years of the Initial Term (or any Option Term), Tenant has not previously exercised any option rights it may have for the succeeding Option Term; provided, however, that Landlord's right to terminate the Lease pursuant to this Section is conditioned on Landlord simultaneously terminating the leases of all similarly affected tenants in the Hospital.

11.2   Restoration and Rent Abatement.  If this Lease is not terminated, Landlord shall repair and restore the Premises and/or the Building/Hospital, as the case may be, within 180 days, and this Lease shall continue; provided, however, that commencing on the date of the damage or destruction and continuing until repair or restoration is substantially complete and Tenant is open for the business upon the Premises, all rental hereunder shall be proportionately abated or reduced, based on the extent to which Tenant's use of the Premises or essential services to the Premises or the Common Areas is impaired.

12.   TAXES

12.1   Taxes Defined.  Taxes means all general real estate taxes and assessments levied against the Property by any authority having the power to tax such interest in the real property.  Landlord shall be responsible for payment of all such Taxes.

12.2   Tenant's Personal Property Taxes.  Tenant shall pay, prior to delinquency, any and all personal property taxes levied against Tenant's leasehold improvements, fixtures, equipment, furniture and other personal property located within the Premises.

13.   UTILITIES

Landlord shall pay for all water, gas, electricity and all other utilities used by Tenant during the Term in the Premises.  Landlord agrees that, as of the Commencement Date, the Premises shall have readily available to it water, telephone, gas, electricity and all other utilities, all sufficient for Tenant's intended use, but in no event of less capacity than as may be specified in Exhibits C and C-1 or as may be required by law or regulation.  Landlord shall bear all costs for installation of utility lines to the Premises including any hook-up fees, connection fees, traffic impact fees and other extraordinary fees.  If any utility or service to the Premises which is provided by Landlord or under Landlord's control, is interrupted for more than twenty-four (24) hours, or is interrupted for more than twenty four (24) hours due to the negligence of Landlord or its agents or contractors, then Tenant's rent and all other charges hereunder shall abate during the period such utility or service is interrupted.

14.   COMMON AREAS

14.1   "Common Areas"" Defined.  "Common Areas" means all parking areas, landscaping, sidewalks and other areas and facilities on the Hospital intended for the common use of the occupants of the Hospital and their agents, employees and customers.  "Operating Expenses" means  the costs that are directly attributable to maintaining, operating, and providing services to and for the Building, the Hospital, the Premises and Common Areas.  Landlord shall be responsible for payment of all Operating Expenses.

15.   ASSIGNMENT AND SUBLETTING

Tenant may assign this Lease, or sublet all or a portion of the Premises, with Landlord's consent, which shall not be unreasonably withheld, conditioned, or delayed.  Notwithstanding the foregoing, Tenant shall have the right, without Landlord's consent, to assign this Lease or sublease all or a portion of the Premises to an entity that: (a) controls, is controlled by, or is under common control with Tenant (each is an "Affiliate"); (b) arises as a result of a consolidation, merger or other reorganization with Tenant and/or Tenant's Affiliate; (c) owns or acquires all or substantially all of the assets or stock of Tenant and/or Tenant's Affiliate; (d) is an authorized franchisee or licensee of Tenant, and/or Tenant's Affiliate, (each of the foregoing is a "Permitted Transfer" and each such assignee or sublessee is a "Permitted Transferee").  Landlord

16

shall not be entitled to any consideration in connection with any assignment of the Lease or sublet of the Premises.  For the purpose of this Lease, any sale, issuance or transfer of Tenant's capital stock through any public exchange, redemption, issuance of additional stock of any class or otherwise shall not be deemed an assignment, subletting or any other transfer of the Lease or the Premises. If Landlord's consent is required for an assignment or sublease, then Landlord's consent shall be deemed to have been given unless Landlord notifies Tenant in writing of the reasons for Landlord's disapproval within fourteen (14) days of receipt of the request. Any transferee hereunder shall be required to operate at the Premises pursuant to the use clause hereunder, and under the trade name Au Bon Pain or the trade name then being used by Tenant at the Premises.  In the event that the transferee will use the Premises for a different use than set forth herein, and/or under a different trade name, Landlord shall have the right to approve such change, or Landlord may elect to terminate this Lease.

16.   DEFAULT

16.1   <u>Tenant Default</u>.

(a)   The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

(i)   The failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) business days after Landlord notifies Tenant in writing of such failure; provided, however, that in no event shall Landlord be required to provide such notice to Tenant more than two (2) times per calendar year; or

(ii)   The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant; provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

Notwithstanding any other provision hereof, Landlord shall reasonably mitigate any damages incurred as a result of Tenant's default hereunder.

(b)   Notwithstanding the foregoing or anything in the Lease to the contrary, in the event that Tenant has assigned this Lease or sublet the Premises to a franchisee or licensee of Tenant or Tenant's Affiliate, Tenant (or Tenant's franchisor) may cure any default by such franchisee or licensee and Landlord agrees to accept the performance of Tenant (or Tenant's franchisor) of such obligation provided such default is cured within the cure periods specified in this Lease. In the event that such franchisee or licensee is in default of its franchise agreement, Tenant (or Tenant's franchisor) shall, without Landlord's consent, have the right to become the "Tenant"

under the Lease subject to the following terms and conditions: (a) Tenant (or Tenant's franchisor) accepts an assignment of the Lease or sublease of the Premises back from the franchisee or licensee, (b) Tenant (or Tenant's franchisor) immediately satisfies (within the time periods set forth in this Lease) all outstanding rental obligations and cures all defaults existing under this Lease as of the date of such transfer, and (c) Tenant (or Tenant's franchisor) provides Landlord with a written indemnity agreement in a form reasonably acceptable to Landlord, agreeing to pay for, defend (with an attorney reasonably approved by Landlord), indemnify, and save Landlord harmless against and from any real or alleged damage or injury and from all claims, judgments, liabilities, costs and expenses, including attorneys' fees and costs, arising out of or connected with any claim by such franchisee or licensee that Tenant (or Tenant's franchisor) does not have any rights to take possession of the Premises or to an assignment of the Lease.

16.2   <u>Landlord Default</u>.  If Landlord should be in default in the performance of any of its obligations under this Lease, which default continues for a period of more than thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default is of a nature to require more than thirty (30) days for remedy and continues beyond the time reasonably necessary to cure (unless Landlord has undertaken procedures to cure the default within such thirty (30) day period and diligently pursues such efforts to cure to completion), Tenant may, at its option:  (a) terminate this Lease, (b) incur any expenses necessary to perform the obligation of Landlord specified in such notice and deduct such expense from the rents next falling due, until the entire credit is absorbed, (c) seek money damages, or (d) pursue the remedy of specific performance, in addition to any other remedies Tenant may have hereunder or at law or in equity.  Landlord's performance of each and every of its covenants and agreements herein contained shall be a condition precedent to Landlord's right to collect rents or to enforce this Lease.  Notwithstanding the foregoing, in the event of a bona fide emergency, the period of time for cure of a breach by Landlord hereunder shall be reduced to the shortest reasonable period of time that is practical under the circumstances.

17.   EMINENT DOMAIN

17.1   If the Premises or any portion thereof are taken under the power of eminent domain, or sold by Landlord under the threat of the exercise of such power (all of which is herein referred to as "condemnation"), this Lease shall terminate as to the part so taken as of the earliest of the following occur: (i) twenty (20) days after Tenant gives notice to Landlord of its election to vacate following the date the condemnor gives a notice of intention to take or the condemning authority takes title to the Premises or the portion thereof, or (ii) the date the condemning authority takes possession of the Premises or the portion thereof.  The party who receives the condemnor's notice of intention to take shall immediately give written notice of such receipt to the other party. If more than twenty-five percent (25%) of the Premises, or the Building/Hospital or the Property, is taken by condemnation, or if the effect of condemnation is to render the Premises insufficient for Tenant's use in its reasonable business judgment, either Landlord or Tenant may terminate this Lease at any time after the condemning

authority gives notice in writing of such election within twenty (20) days after the giving of notice of the taking or, in the absence of such notice, then within twenty (20) days after the condemning authority shall have taken possession; provided, however, that Landlord's right to terminate the Lease pursuant to this Section is conditioned on Landlord simultaneously terminating the leases of all similarly affected tenants in the Hospital.

17.2   If this Lease is not terminated by either Landlord or Tenant, then it shall remain in full force and effect as to the portion of the Premises remaining, provided the Base Rent shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to taking.  If this Lease is not terminated, then Landlord agrees, at Landlord's sole cost, to restore the Premises as soon as reasonably possible to a complete unit of like quality, character and utility for Tenant's purposes as existed prior to the condemnation.  Notwithstanding anything contained herein to the contrary, if the Premises are not repaired and restored within one hundred and eighty (180) days from the date of the condemnation, then Tenant may cancel the Lease at any time after the one hundred and eightieth (180th) day and before the two hundred and tenth (210th) day following the date of condemnation.  Nothing contained herein shall be deemed or construed to prevent Landlord or Tenant from enforcing and prosecuting a claim or claims for the value of its respective interest or rights in connection with any condemnation proceedings, whether partial or complete.

18.   SIGNAGE

Tenant, at its cost, shall have the right to install or place signs on the exterior of the Premises to the maximum extent permitted by law; provided that Tenant obtains Landlord's written consent, which consent shall not be unreasonably withheld provided that such signage conforms to the signage criteria for the Hospital previously provided to Tenant. Tenant shall have the right, at its own expense, to maintain within the interior of the Premises any signs and advertising materials customary or appropriate in the conduct of Tenant's business, provided that same are professionally prepared, in keeping with the standards of the Hospital and with the standards of other Au Bon Pain stores in the Maryland/DC/Virginia region. Landlord shall not allow any signage other than Tenant's to be placed on the exterior walls of the Premises. Landlord hereby consents to Tenant's trademarked logo, letters and colors in Tenant's current and future exterior signage. Landlord shall have reasonable approval rights over all advertising by Tenant in the Hospital outside the Premises, and Landlord shall have the right to limit and/or prevent the distribution by Tenant of any pamphlets, leaflets or similar advertising in the Hospital.

19.   PATIO AND ADJACENT SEATING.

Tenant may provide non-exclusive patio seating for its customers on the Property adjacent to the Premises, in the patio seating area as shown by cross-hatching on Exhibit E, at any time during the Term of this Lease at no additional rental. Such outdoor seating area is called the "Patio Area."  Tenant, at its cost, shall comply with all relevant state provincial, municipal or local laws, regulations, rules or ordinances

with respect to Tenant's operations conducted on the Patio Area, and obtain all necessary permits and/or licenses for the same.  Tenant shall clean the Patio Area exclusively serving its customers, and keep it in a reasonably clean and neat fashion. Tenant may place its standard patio furnishings thereon.  Landlord represents that the Premises is zoned for a restaurant use and that there is no zoning or other legal or local laws ordinances, underlying documents or restrictions of any kind that will now or in the future preclude Tenant from maintaining tables and chairs outdoors adjacent to the Premises for its Patio Area.  Landlord shall not do anything by way of act or omission that indirectly or directly negatively impacts Tenant's ability to use the Patio Area, but in no event shall Tenant's use of the Patio Area extend beyond the area as shown on Exhibit E.  Landlord agrees, prior to delivery of the Premises, to remove the large planter currently in the Patio Area.

In addition, Tenant shall be permitted to maintain tables and chairs in the area in the lobby adjacent to Tenant's primary unit, as shown on Exhibit B-1 attached hereto, for exclusive use by Tenant's customers (the "Adjacent Seating Area").  Tenant agrees to keep the Adjacent Seating Area reasonably neat and clean, and to maintain its tables and chairs in such area. Tenant shall have no rental obligations with respect to such Adjacent Seating Area. In no event shall Tenant's use of the Adjacent Seating Area extend beyond the area as shown on Exhibit B-1.

20.    TRASH.

At its cost, the Landlord will provide daily trash collection services for the Tenant which will include at least one collection every 8 hours with more frequent visits during the lunch rush hour if requested. Tenant will provide the appropriate type and number of waste receptacles and bags for waste collection on site at its own cost. Tenant will ensure that all waste is properly bagged, sealed and made ready for collection. All boxes must also be flattened in preparation for waste collection.  Tenant will work with the Housekeeping Hospitality Services (HHS) department to establish a specific waste collection schedule.

21.    TITLE OF LANDLORD

The University of Maryland Medical System ("UMMS") is entering into this Lease for itself and on behalf of its affiliates.  The University of Maryland Medical Center ("UMMC") is an affiliate of UMMS and is authorized by Landlord to enter into this Lease. Each location set forth herein (the primary location and Paca Pratt) will be managed and operated as a separate entity, with the Senior Director of Operations (currently Johnie E. Carr) serving as the point of contact for UMMC (the primary unit) and the Corporate Senior Manager, Properties and Facilities (currently Calvin Hoffmaster) serving as the point of contact for UMMS (Paca Pratt).  Tenant shall allocate day to day operations needs and requests accordingly.

UMMS represents and warrants that it is the fee owner of the Premises, the Building, the Hospital, and the Property and that both UMMS and UMMC have the full right and lawful authority to enter into and perform Landlord's obligations under this Lease; that UMMS has good marketable title to the Premises, the Building, the Hospital, and the Property, free and clear of any matters of record and/or any governmental regulations including, without limitation, use limitations, zoning codes or ordinances, which prevent the Premises and the Property from being used as set forth in this Lease. There are no encumbrances, liens, agreements, covenants in effect that would limit Tenant's rights or augment Tenant's obligations hereunder; and Landlord further represents and warrants that it will not enter into any such encumbrances, liens, agreements or covenants that do so. Landlord is unaware of any impending condemnation plans, proposed assessments or other adverse conditions relating to the Property Further, Landlord represents and warrants that there are no, and in the future shall be no, physical or legal conditions and/or impediments affecting the Premises that would now, or in the future, have the effect of: (a) disrupting, impairing or prohibiting, in any way, Tenant's intended use of the Premises, (b) increasing Tenant's obligations under the Lease, or (c) decreasing Tenant's rights hereunder.

22.   SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT

Tenant shall, upon Landlord's request, subordinate this Lease to any mortgage or deed of trust placed by Landlord upon the Premises, the Hospital,  or the Building; provided, that such mortgage or deed of trust, by its terms or by separate written agreement with Tenant, provides that if Tenant is not then in default under this Lease past the applicable cure period, this Lease shall not terminate as a result of the foreclosure of such mortgage or deed of trust, and Tenant's rights under this Lease shall continue in full force and effect and Tenant's possession of the Premises shall be undisturbed except in accordance with the provisions of this Lease. Tenant will attorn to such holder of the mortgage or deed of trust (or successor-in-interest of the holder of the mortgage or deed of trust) as its landlord under the terms of this Lease.

23.   INTENTIONALLY DELETED

24.   QUIET POSSESSION

Without limiting any rights Tenant may have by statute or common law, Landlord covenants and agrees that, so long as this Lease is in full force and effect, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without disturbance by Landlord or by any person having title paramount to Landlord's title or by any person claiming through or under Landlord.

25.   INTENTIONALLY DELETED

26.   HOLDING OVER

If Tenant shall remain in possession of the Premises or any portion thereof after the expiration of the term of this Lease then, in the absence of an agreement in writing between Landlord and Tenant, the party remaining in possession shall be deemed a

tenant at sufferance, until acceptance of rent by Landlord, at which time the person in possession shall become a tenant from month-to-month at one hundred and fifty percent (150%) of the Base Rent previously in effect, but otherwise under the same terms and conditions as existed immediately prior to the expiration of the Lease.

27.    SURRENDER AND TENANT'S REMOVAL OF FIXTURES AND PERSONAL PROPERTY

Upon the expiration or termination of this Lease, Tenant shall surrender the Property to Landlord in broom clean condition, except for ordinary wear and tear and damage caused by casualty or condemnation, whether or not insured or insurable.  At any time during the Term or at the expiration or other termination of the Term of this Lease, Tenant shall have the absolute and unrestricted right to remove from the Premises any or all items to protect Tenant's intellectual property interests, trade fixtures, equipment, furniture, machinery, and other personal property installed or paid for by Tenant, howsoever affixed to the Premises.  Tenant shall repair any damage to the Premises resulting from the removal of such items.

28.    NONINTERFERENCE

Notwithstanding anything contained herein to the contrary, Landlord, its agents, employees or contractors' entry onto the Premises, or any repair or work performed thereon, or any change made to the Hospital or the Premises shall not in any way materially or unreasonably affect or interrupt with Tenant's use, business or operations on the Premises or obstruct the visibility or ingress and egress of the Premises (including, without limitation, Tenant's exterior signage).  Landlord shall be liable for any damage or injury to persons or property caused by any negligent, or willful act or omission of Landlord, its agents, employees, invitees, guests or contractors resulting from its and/or their entry onto or the repair or any other work performed.  Landlord shall give Tenant no less than seventy-two (72) hours notice before any entry hereunder, unless an emergency requires shorter notice.  In any event, Landlord shall use reasonable efforts not to perform such repairs and maintenance during lunch and breakfast hours.

29.    FORCE MAJEURE

In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party and such delay or hindrance is due to strikes, lockouts, failure of power or other utilities, injunction or other court or administrative order, governmental law or regulations which prevent or substantially interfere with the required performance, condemnations, riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty, acts of God, or other causes not within the control of such party, the performance of any covenant, agreement, work, service,

or other act shall be excused for the period of delay and the period for the performance of the same shall extended by the period.

30.   NOTICE

Whenever under this Lease a provision is made for any demand, notice or declaration of any kind or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other, it shall be in writing and served personally, or sent by registered mail or certified mail, return receipt requested, with postage prepaid, or sent by a nationally recognized overnight carrier with receipt signed therefore, addressed to Tenant or Landlord, as the case may be, at the appropriate address specified in Article 1 hereof.  Either party may by like notice at any time and from time to time designate a different address to which notices shall be sent.  In the event of a sublease or assignment, Tenant may provide additional notice addresses.

31.   MISCELLANEOUS

31.1   Interest.  Except as otherwise provided herein, any sum accruing to Landlord or Tenant under the provisions of this Lease which shall not be paid when due shall bear interest at the rate of ten percent (10%) per annum from the date written notice specifying such non-payment is served upon the defaulting party.

31.2   Partial Invalidity/Severability.  If any term, covenant, condition or restriction of this Lease is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions hereof shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

31.3   No Partnership.  Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third person to create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between the parties other than landlord and tenant.

31.4   Term Definition.  All references to the "Term" of this Lease shall include the Initial Term and Option Terms, if such Option Term or Option Terms have been duly exercised by Tenant.

31.5   Time Of The Essence.  Time is of the essence of the performance of each provision of this Lease.

31.6   Waiver.  The waiver of performance of any covenant, term or condition of this Lease by Landlord or Tenant shall not be construed as a waiver of any subsequent breach of the same covenant, term or condition.

31.7   Gender and Captions.  Words of gender used in this Lease shall be deemed to include other genders, and singular and plural words shall be deemed to include the other, as the context may require.  Paragraph headings in this Lease are for

convenience only, are not a part of the agreement of the parties, and shall not be used to interpret this Lease.

31.8   Successors.   The terms, conditions and covenants herein contained shall inure to the benefit of and be binding upon the heirs, assigns and other successors-in-interest of the parties hereto.  The benefits of this Lease and burdens of this Lease, shall inure to the benefit of and will be binding upon parties hereto and their successors, personal representatives, and assigns. The term "successors" is used herein in its broadest possible meaning and includes, but is not limited to, every person succeeding to any interest in this Lease or the Premises of Landlord or Tenant herein, whether such succession results from the act or omission of such party.

31.9   Choice of Law.  This Lease shall be construed and enforced in accordance with the laws of the State in which the Premises is located.

31.10  Headings.  Paragraph headings, numbers and underscoring have been set forth herein for convenience only, do not define or limit the provisions hereof, and have no significance whatsoever.  The order in which the paragraphs appear in this Agreement has no significance whatsoever.

31.11  Memorandum of Lease.  The parties hereto agree that neither shall record this Lease, but each shall, upon request of the other, execute a Memorandum of Lease confirming the Commencement Date and expiration date of this Lease.

31.12  Consent.  Wherever in this Lease Landlord or Tenant is required to give its consent or approval to any action on the part of the other, such consent or approval shall not be unreasonably withheld or delayed, unless otherwise expressly provided herein.

31.13  Preparer of the Lease.  This Lease has been prepared by Tenant, and its professional advisors, and reviewed by Landlord and its professional advisors. Landlord, Tenant, and their separate advisors believe that this Lease is the product of all of their efforts, that it expresses their agreement, and that it should not be interpreted in favor of either Landlord or Tenant or against either Landlord or Tenant.

31.14  Attorney's Fees.  If either party hereto shall file any action or bring any proceeding against the other party arising out of this Lease or for the declaration of any rights hereunder, the prevailing party therein shall be entitled to recover from the other party all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party as determined by the court, an arbitrator or by settlement.

31.15  Estoppels.  Within thirty (30) days after a request by Landlord or Tenant, as the case may be, Landlord or Tenant shall execute and deliver to the other a reasonable form of estoppel statement.  Such statement shall include representations (i) that this Lease is in full force and effect, (ii) that there are no uncured defaults in the other party's performance hereunder, and/or (iii) that not more than one (1) monthly installment of the Base Rent has been paid in advance.

31.16 <u>Brokers</u>.  Landlord and Tenant hereby represent and warrant that neither party has employed the services of a real estate broker in connection with the lease transaction created hereby, and that there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease except for those payable to the broker listed previously.   Each party hereby holds the other harmless from and shall indemnify and defend the other against any and all liens, claims, demands, liability, loss, cost and expense (including, without limitation, reasonable attorneys' fees) in connection with any claim for such commissions or fees by any third party.

31.17 <u>Change of Ownership</u>.  Landlord shall promptly notify Tenant in writing of any change in the ownership of the Hospital or of the Premises, and shall give the name and address of the new owner and instructions regarding the payment of rent.  In the event of any change in or transfer of title of Landlord in and to the Hospital or the Premises, whether voluntary or involuntary, or by act of Landlord or by operation of law, Tenant shall be under no obligation to pay rents thereafter accruing to the new owner until Tenant shall have been duly notified of such change and given satisfactory proof thereof.  In the event of any such transfer, the transferor shall be freed of all liability thereafter accruing hereunder provided that the new landlord shall assume all of the obligations on Landlord's part to be performed hereunder and a copy of such assumption is delivered to Tenant.

31.18 <u>Authority</u>.  Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

31.19 <u>Severability</u>.  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

31.20 <u>Interpretation</u>.  Article and section headings are not a part hereof and shall not be used to interpret the meaning of this Lease.  This Lease shall be interpreted in accordance with the fair meaning of its words and both parties certify they either have been or have had the opportunity to be represented by their own counsel and that they are familiar with the provisions of this Lease, which provisions have been fully negotiated, and agree that the provisions hereof are not to be construed either for or against either party as the drafting party.

31.21 <u>Cumulative Remedies</u>.  Except where otherwise expressly provided in this Lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

31.22 <u>Confidentiality of Lease</u>.  From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendments hereto or any copies of the same, nor any other information (oral, written

or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Premises (including, without limitation, architectural plans, specifications, site plans and drawings) or Tenant's business, to any person including, without limitation, any brokers, any other tenants in the [Building/Hospital] or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants, current or potential mortgagees, lenders or purchasers of the Property who agree to be bound by the terms of this Section and Tenant may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants and current or potential lenders, assigns or subtenants who agree to be so bound.

     31.23 <u>Marketing.</u>   Landlord will include information about Tenant's business on appropriate web site pages that provide information about food services on the Hospital campus to staff and/or visitors.  Tenant may also include a direct link from the University of Maryland Medical System web site to www.aubonpain.com, including but not limited to pages supporting Tenant's catering services.

## 32.   PAYROLL DEDUCTION PROGRAM.

     Tenant will have the right to participate in all appropriate payroll deduction programs and/or stored value card programs for employees of the University of Maryland Medical System, as such systems are available to similar vendors.  Tenant will provide all necessary hardware, software and phone lines at its own expense.

## 33.   EXHIBITS.

     The following exhibits are attached hereto and by this reference incorporated herein:

| | |
|---|---|
| Exhibit A: | Description of the Hospital |
| Exhibit B: | Site Plan of the Hospital Showing the Premises |
| Exhibit B-1: | Adjacent Seating Area |
| Exhibit C: | Construction of Premises |
| Exhibit C-1: | Landlord's Work |
| Exhibit C-2: | Possession Letter |
| Exhibit C-3: | Demolition Work |
| Exhibit C-4: | Property Remaining in Paca Pratt |
| Exhibit D: | Current Exclusive Uses |
| Exhibit E: | Patio Area |

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD

THE UNIVERSITY OF MARYLAND MEDICAL SYSTEM

BY: _Cory H. Kane_

ITS: _VP Supply Chain_

THE UNIVERSITY OF MARYLAND MEDICAL CENTER

BY: _Herb Buchanan_

ITS: _SVP/COO_

STATE OF _Maryland_ )
                                    ) ss.
~~COUNTY~~ OF _Baltimore_  )
_city_

On this _4_ day of _March_ , 20__, before me, the undersigned, a Notary Public in and for the _University of UMMS_ , duly commissioned and sworn, personally appeared _Herb Buchanan_ , to me known as, or providing satisfactory evidence that he/she is the _Senior VP_ of _Univ. of Maryland Med. Ctr., a Univ. of Maryland Med. System_ the _Corporation_ that executed the foregoing instrument and acknowledged the such instrument to be the free and voluntary act and deed of such _Corporation_ for the uses and purposes therein mentioned and on oath stated that he/she is authorized to execute such instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_Ellen B. Butler_
NOTARY PUBLIC in and for the _University_ of _UMMS_
residing at _22 S. Greene St., Balto, MD 21201_
My commission expires _09/11/2014_
Print Name: _Ellen L. Butler_

27

STATE OF _____    )
                        ) ss.
COUNTY OF _____    )

On this _____ day of _____, 200_, before me, the undersigned, a Notary Public in and for the _____ of _____, duly commissioned and sworn, personally appeared _____, to me known as, or providing satisfactory evidence that he/she is the _____ of _____, a _____, the _____ that executed the foregoing instrument and acknowledged the such instrument to be the free and voluntary act and deed of such _____ for the uses and purposes therein mentioned and on oath stated that he/she is authorized to execute such instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_____

NOTARY PUBLIC in and for the _____ of _____
residing at _____
My commission expires _____
Print Name: _____

TENANT
ABP CORPORATION

BY: _JOHN P. BILLINGSLEY_
ITS: _EVP / CDO_

STATE OF _Massachusetts_ )
                               ) ss.
COUNTY OF _Suffolk_   )

On this _1st_ day of _March_____, 200_1_, before me, the undersigned, a Notary Public in and for the _EVP/CDO_ of _ABP Corp._____, duly commissioned and sworn, personally appeared _John Billingsley_, to me known as, or providing satisfactory evidence that he/she is the _EVP/CDO_____ of _ABP Corp._____, a _Delaware Corp_____, the _Corporation_ that executed the foregoing instrument and acknowledged the such instrument to be the free and voluntary act and deed of such _Corporation_ for the uses and purposes therein mentioned and on oath stated that he/she is authorized to execute such instrument.

WITNESS my hand and official seal hereto affixed the day and year in this certificate above written.

_Lisa Ann Glass_
NOTARY PUBLIC in and for the _EVP/CDO_ of _ABP Corp._
residing at __17 Lamb St, Attleboro ma 02703__
My commission expires __2-2-2012__
Print Name: ____Lisa Ann Glass____



LISA ANN GLASS
Notary Public
Commonwealth of Massachusetts
My Commission Expires Feb 2, 2012

EXHIBIT A

DESCRIPTION OF THE HOSPITAL

The University of Maryland Medical Center (UMMC) is a 705-bed Academic Medical Center –
located on the West side of downtown Baltimore and is home to the University of Maryland
Marlene and Stewart Greenebaum Cancer Center, the R Adams Cowley Shock Trauma Center,
the University of Maryland Hospital for Children and the University of Maryland Division of
Transplantation. The center has more than 6,000 employees. The building in which the primary
unit is located is bound by W. Lombard Street to the South, N. Greene Street to the East, W.
Baltimore Street to the North and S. Martin Luther King Jr. Blvd to the West.  The Paca Pratt
building is bound by W. Pratt Street to the South, S. Paca Street to the East, W.  Lombard Street
to the North and N. Greene Street to the West.

The Medical Center is distinguished by discovery-driven tertiary and quaternary care for the
entire state and region and innovative, highly specialized clinical programs.

EXHIBIT B

SITE PLAN OF THE HOSPITAL SHOWING THE PREMISES

SEE ATTACHED



Leased Area
in Red



1,704 sf

EXHIBIT B-1

ADJACENT SEATING AREA



EXHIBIT C

CONSTRUCTION OF PREMISES

I.    GENERAL REQUIREMENTS

A.    Landlord's Information Package.  Landlord shall deliver to Tenant two (2) sets of drawings of existing work and/or proposed work to be performed on or to the Premises by Landlord.  Such drawings shall include floor plans, elevations, section and detail drawings and mechanical, electrical and plumbing plans including HVAC.  HVAC plans shall specify the duct layout and methods of installation and include the manufacturer's name and a schedule of all equipment including the capacity of each HVAC unit. Plans to include all information necessary for Tenant to design a complete and permitable set of drawings.

B.    Tenant's Plans.  Upon receipt of Landlord's Information Package, Tenant shall proceed to prepare working drawings and specifications ("Preliminary Plans") for submittal to Landlord's architect to incorporate drawings and specifications necessary for Landlord to obtain all permits required for Landlord to construct the Premises.

C.    Approval of Tenant's Plans.  Landlord shall have ten (10) days from receipt of Tenant's Preliminary Plans in which to approve or disapprove such Preliminary Plans.  If Landlord shall fail to approve or disapprove such Preliminary Plans within such ten (10) day period, then the same shall be deemed approved and shall constitute final plans.  If Landlord shall disapprove such Preliminary Plans, then Landlord, within such ten (10) day period, shall so notify Tenant, in writing, specifying each aspect of such Preliminary Plans to which Landlord takes exception, together with detailed written suggestions or requirements as to how Tenant should rectify any alleged discrepancies and/or deficiencies, and Landlord shall approve or disapprove such revised Preliminary Plans.  If Landlord and Tenant are unable to reach agreement concerning plans, Tenant shall be entitled to terminate this Lease.  Once Landlord approves the revised Preliminary Plans, the same shall constitute final plans for the construction of the Premises by Landlord.  Landlord agrees that it shall not withhold consent to Tenant's Preliminary Plans to the extent that such plans reflect Tenant's typical build out in the region.

D.    Permits and Fees.  Landlord, at Landlord's expense, shall be responsible for providing all drawings and obtaining all permits necessary to complete Landlord's Work.  Landlord shall also be responsible for the payment of all fees including, but not limited to, plan check, water usage, utility connection, or road impact fees, whether required by local governmental authorities as a pre-condition to Tenant being able to commence "Tenant's Work" (as hereinafter defined) and/or occupy and use the Premises as more particularly provided in the Lease or otherwise.  Tenant shall be responsible for permits and fees as it relates to Tenant's Work.

E.    No Chargebacks.  Notwithstanding anything in any design criteria, handbook, the Lease or any exhibit, Tenant shall not be liable to Landlord for any

chargebacks relating to Landlord's preparation of the Premises for Tenant.  No other charges or fees of any kind shall be borne by Tenant to Landlord or its agents pursuant to its plan approval or construction.  In no event shall Tenant be required to pay for any construction deposit or any construction bonds.

II.     CONSTRUCTION OF LANDLORD'S WORK AND TENANT'S WORK

A.     Landlord's Work.  Landlord shall, at Landlord's expense, construct the Premises in accordance with the requirements set forth on Exhibit C-1, in a first-class workmanlike manner and in accordance with local current building code requirements. To the extent the requirements set forth in Exhibit C-1 are inconsistent with Tenant's final plans, the latter shall control. Landlord shall tender delivery of possession of the Premises to Tenant and Tenant shall execute Exhibit C-2 to confirm acceptance or refuse acceptance.  Landlord will walk through with Tenants contractor the day after the current Tenant moves out.  Landlord's participants in the walkthrough will include UMMC Safety, Infection Control, Operations & Maintenance and Project Management team members.

The Landlord will work with the current tenant and Tenant to determine what will be taken out and what will be turned off.

Tenant will proceed with the demolition and Landlord will monitor their progress accordingly.

Landlord agrees to have the Tenant perform the necessary demolition for construction of its spaces in both the main hospital and the Paca Pratt locations, as such demolition work and pricing is set forth on Exhibit C-3 attached hereto. Landlord shall reimburse Tenant for the total cost of such demolition, which total costs shall not exceed $19,085 for the primary unit and $12,185 for Paca Pratt.  Landlord shall reimburse Tenant for the cost of such demolition within thirty (30) days after receipt of invoice for same from Tenant. If Landlord fails to reimburse Tenant for such total costs within such thirty (30) day period, Tenant shall be entitled to offset the cost of such demolition work against Base Rent each month until the cost thereof is fully recouped.

B.     Tenant's Work.  Any construction work which must be performed in order to bring the Premises to a condition which is suitable for the operation of Tenant's business therefrom (except as already specified as Landlord's Work) shall be deemed "Tenant's Work" for purposes of this Exhibit C and the Lease.

C.     Punch List Procedure.  Despite the fact that Landlord may have substantially completed and delivered possession of the Premises to Tenant, Landlord shall, within fifteen (15) days after receipt from Tenant of a written list of claimed defects or variations ("Punch List") proceed to cure any such defects or variations with all due diligence in accordance with a schedule which is reasonably acceptable to Tenant.   Latent defects appearing as a result of Landlord's Work shall not be deemed waived until the first anniversary of the Commencement Date.  Upon the first

anniversary, all latent defects shall be waived unless Tenant shall have given notice of same to Landlord prior to the first anniversary.  Notwithstanding such waiver, Landlord's obligation to make repairs under this Lease shall survive.

   D. Landlord shall not at any time during the Term of this Lease use any contractors or labor or materials whose use in Tenant's reasonable judgment would create or creates any difficulty with other contractors or labor employed by Tenant or Landlord other others in the construction, maintenance or operation of the Premises or Building.

   E. In no event shall Tenant be obligated to use union labor.

EXHIBIT C-1

LANDLORD'S WORK

AU BON PAIN
STANDARD PROJECT DEVELOPMENT WORK LETTER
UMMC – Main Unit

It is the intent of this document to define the items that Au Bon Pain requires for the design and construction its restaurant.

**GENERAL REQUIREMENTS**
Leased premises shall be;
1. Abated of all hazardous materials in any and all forms including but not limited to asbestos, products containing asbestos, polychlorinated biphenyl (PCB) or other toxic substances.
2. cleared of all stored materials, fixtures, furniture, equipment and refuse, including security gates, internal doors, interior walls and millwork (except for existing brew station millwork, which shall remain).
3. along an accessible route from the parking area to the main entrance of the Tenant's leased premises.
4. free of rodents, insects and vermin.

**FLOOR SLABS**
Floor slabs shall be;
1. structurally sound and capable of sustaining current building code live and dead loads throughout.
2. one level throughout the leased premises.
3. broom clean and ready for the tenant's flooring.
4. tested to assure excessive slab moisture is not present.

**DEMISING PARTITIONS**
Demising partitions shall be;
1. code compliant to restrict the spread of smoke and fire.
2. constructed and insulated continuously from the floor slab tight to the underside of the deck above
3. free from holes depressions which would require patching and repair.
4. if newly constructed, taped, sanded and primed ready for tenant's finishes.

**EXTERIOR STOREFRONT SYSTEM**
Exterior storefront shall be;

36

1. insulated glazing compliant with impact resistance, wind loading and energy conservation code requirements.

## SECONDARY DOORS - SECONDARY EGRESS
Secondary doors shall be;
1. a minimum of one single operable, lockable, insulated metal or tempered glass door 3'-0" x 7'-0" with panic device, door pull, closer, continuous or secure hinges, weather-stripping and a door sweep.
2. open to a code compliant fire-rated exit corridor or directly to the exterior.
3. in compliance with accessibility regulations
4. open on to an accessible route or fire-rated area of refuge.
5. Separated from the primary egress doors by a distance no less than ¼ of the longest diagonal across the leased space.

## CLEAR DECK HEIGHT
1. Demo all ceiling to obtain max height available

## PERMANENT UTILITIES – GENERAL
All permanent utilities shall be;
1. made available by the Landlord to a point either;
   a. within the leased premises
   b. or along an approved Landlord route to the Tenant's leased premises from approved Landlord tie-in points. Tie-in points shall be identified by the Landlord and confirmed by the Tenant's engineer prior to the Tenant's design team beginning final contract documents.
2. available, or will be operational prior to construction.

## TEMPORARY UTILITIES – GENERAL
Temporary utilities required for construction shall be;
1. 208V, 3 phase, 200A electrical service
2. 3 dedicated phone lines
3. 1/2" water connection at 45 psi

## DOMESTIC WATER SERVICE
Domestic water service shall be;
1. a 2" copper line and meter of 1-1/2" (if flush valve toilets are used) supporting a peak flow of 60 gallons per minute, with a minimum static pressure of 50 psi.
2. a minimum of 250 gallons per hour of domestic hot water for Tenant's use if separate hot water is provided by the Landlord.

## SPRINKLER SERVICE
Sprinkler service size shall be either;
1. 6" diameter fire
2. or 4" diameter fire line if static and residual are certified as adequate for service without use of a tenant-owned fire pump.

## SANITARY AND GREASE LINES

Sanitary and grease line piping shall be either;
1. 4" diameter dedicated lines.
2. 4" diameter combined sanitary and grease line.

## NATURAL GAS SERVICE
1. remove and cap all natural gas lines back to source.

## MECHANICAL – LANDLORD AIR BASED SYSTEMS
Landlord's air based mechanical systems shall provide;
1. a minimum of one ton of cooling per 140 square feet of leased floor area, with kitchen zoned separately from dining, which shall be available 24/7/365.
2. a dedicated, fire rated chase to the roof with an 18"x18" duct capable of providing up to 2700 CFM of fresh air.

## MECHANICAL – TENANT AIR BASED SYSTEMS
Tenant's air based mechanical systems shall require;
1. a dedicated, fire rated chase to the roof with an 18"x18" duct capable of providing up to 2700 CFM of fresh air.
2. space on the roof adequate for heating and a/c units, exhaust fans, including scrubbers, if required, and makeup air fans.

## MECHANICAL – LANDLORD WATER BASED SYSTEMS
Water based mechanical systems shall provide;
1. a minimum of one ton of cooling per 120 square feet of leased floor area , with kitchen zoned separately from dining, which shall be available 24/7/365
2. a minimum of 60 BTU/hr of heating per square foot of leased floor area, which shall be available 24/7/365.

## HEAT EXHAUST
Heat exhaust shall be via;
1. in a multi-story building, a dedicated, fire rated chase to the roof with an 18"x18" welded, stainless steel duct for Tenant's heat exhaust.

## ELECTRICAL SERVICE
Electric service size shall be;
1. for a 3,000 S.F. space utilizing electric heat and all electric equipment;
   a. if at 480 V, 400 Amp minimum service size.
   b. if at 208 V, 800 Amp minimum service size.
2. for a 900 S.F. space utilizing electric heat and all electric equipment;
   a. if at 480 V, 200 Amp minimum service size.
   b. if at 208 V, 400 Amp minimum service size.
3. made available by the Landlord in the required size and voltage.
4. confirmed by the Tenant's engineer.

## FIRE ALARM

Fire alarm service shall be;
1. coordinated by the Tenant's engineer. Tenant's engineer shall verify device compatibility and specify required components.
2. active when approved fire alarm vendor completes final tie in to Landlord's panel.

## TELEPHONE
Telephone service shall be;
1. a minimum dedicated 2" diameter conduit with pull strings.

## TESTS AND LANDLORD CERTIFICATIONS REQUIRED BY TENANT
1. Hazardous material abatement reports and certifications
2. Proof of zoning compliance for tenant's use including;
   a. Zoning approval documents
   b. Previous certifications of occupancy
3. Report of the moisture content of new concrete floor slabs
4. Documentation of previous extermination treatments or citations.

## INFORMATION REQUIRED BY THE TENANT
1. Landlord site/space development criteria.
2. As built documents in either electronic or paper form. Documents should provide information relative to all aspects of the leased premises' construction. (I.E. Architectural, structural, mechanical, electrical, plumbing, fire protection and alarm systems) in addition to that of the leased premises' adjacent, above and below the tenant's leased premises.
3. Disclosures as to the presence of structural floor systems, underground utilities and public transit tunnels.
4. Requirements or regulations requiring off / after hour work or loading.
5. Designated
   a. Landlord representative for design and construction
   b. loading zones and times
   c. approved dumpster locations
   d. Union or open shop labor requirements
6. Acknowledgement that the Tenant's drawings have been reviewed and approved by a designated agent qualified to perform a review for compliance with the Landlord's design, construction and lease criteria.

## AU BON PAIN
## STANDARD PROJECT DEVELOPMENT WORK LETTER
### UMMC - Paca Pratt unit

It is the intent of this document to define the items that Au Bon Pain requires for the design and construction its restaurant.

## GENERAL REQUIREMENTS

Leased premises shall be;

5. abated of all hazardous materials in any and all forms including but not limited to asbestos, products containing asbestos, polychlorinated biphenyl (PCB) or other toxic substances.
6. cleared of all stored materials, fixtures, furniture, millwork, equipment and refuse, except for attached list  (per previous agreement). Soda system bag & box to remain intact for ABP GC to cut soda lines 36" aff.
7. along an accessible route from the parking area to the main entrance of the Tenant's leased premises.
8. free of rodents, insects and vermin.

## FLOOR SLABS

Floor slabs shall be;

5. structurally sound and capable of sustaining current building code live and dead loads throughout.
6. one level throughout the leased premises.
7. broom clean and ready for the tenant's flooring.
8. tested to assure excessive slab moisture is not present.

## DEMISING PARTITIONS

Demising partitions shall be;

5. code compliant to restrict the spread of smoke and fire.
6. constructed and insulated continuously from the floor slab tight to the underside of the deck above
7. free from holes depressions which would require patching and repair.
8. if newly constructed, taped, sanded and primed ready for tenant's finishes.

## EXTERIOR STOREFRONT SYSTEM

Exterior storefront shall be;

2. insulated glazing compliant with impact resistance, wind loading and energy conservation code requirements.

## STOREFRONT DOORS – PRIMARY EGRESS

Storefront doors shall be;

1. one pair of operable, lockable, tempered glass doors 3'-0" x 7'-0"  with panic devices, door pulls, closers, continuous or secure hinges, weather-stripping and door sweeps.
2. in compliance with accessibility regulations
3. open on to an accessible route
4. be level in transition with the sidewalk, patio or mall corridor to a distance of 5'-0" from the face of the doors in a closed position.

## SECONDARY DOORS - SECONDARY EGRESS

Secondary doors shall be:

6. a minimum of one single operable, lockable, insulated metal or tempered glass door 3'-0" x 7'-0" with panic device, door pull, closer, continuous or secure hinges, weather-stripping and a door sweep.
7. open to a code compliant fire-rated exit corridor or directly to the exterior.
8. in compliance with accessibility regulations
9. open on to an accessible route or fire-rated area of refuge.
10. Separated from the primary egress doors by a distance no less than ¼ of the longest diagonal across the leased space.

## RECEIVING DOORS

Receiving doors shall be:

1. a minimum of one single operable, lockable, insulated metal door 3'-0" x 7'-0" with panic device, door pull, closer, continuous or secure hinges, weather-stripping and a door sweep.
2. open to a approved Landlord service area
3. not used or considered egress doors if passage through a kitchen is required.

## CLEAR DECK HEIGHT

1. as exists

## PERMANENT UTILITIES – GENERAL

All permanent utilities shall be;

3. made available by the Landlord to a point either;
   a. within the leased premises
   b. or along an approved Landlord route to the Tenant's leased premises from approved Landlord tie-in points. Tie-in points shall be identified by the Landlord and confirmed by the Tenant's engineer prior to the Tenant's design team beginning final contract documents.
4. available, or will be operational prior to construction.

## TEMPORARY UTILITIES – GENERAL

Temporary utilities required for construction shall be;

4. 208V, 3 phase, 200A electrical service
5. 3 dedicated phone lines
6. 1/2" water connection at 45 psi

## DOMESTIC WATER SERVICE

Domestic water service shall be;

3. a 2" copper line and meter of 1-1/2" (if flush valve toilets are used) supporting a peak flow of 60 gallons per minute, with a minimum static pressure of 50 psi.
4. a minimum of 250 gallons per hour of domestic hot water for Tenant's use if separate hot water is provided by the Landlord.

**SPRINKLER SERVICE**
Sprinkler service size shall be either;
3. 6" diameter fire
4. or 4" diameter fire line if static and residual are certified as adequate for service without use of a tenant-owned fire pump.

**SANITARY AND GREASE LINES, grease trap stays intact**
Sanitary and grease line piping shall be either;
3. 4" diameter dedicated lines.
4. 4" diameter combined sanitary and grease line.

**NATURAL GAS SERVICE**
Natural gas service shall be;
1. of circa 3,000 MBH at a minimum of 10" WC – circa 1,300 MBH for cooking, and circa 1,700 MBH for heating, makeup air and hot water.

**MECHANICAL – LANDLORD AIR BASED SYSTEMS**
Assumes landlord leaves existing systems for ABP reuse and that systems qualify as per below.
Landlord's air based mechanical systems shall provide;
3. a minimum of one ton of cooling per 140 square feet of leased floor area, with kitchen zoned separately from dining, which shall be available 24/7/365.
4. a dedicated, fire rated chase to the roof with an 18"x18" duct capable of providing up to 2700 CFM of fresh air.

**MECHANICAL – TENANT AIR BASED SYSTEMS**
Tenant's air based mechanical systems shall require;
3. a dedicated, fire rated chase to the roof with an 18"x18" duct capable of providing up to 2700 CFM of fresh air.
4. space on the roof adequate for heating and a/c units, exhaust fans, including scrubbers, if required, and makeup air fans.

**MECHANICAL – LANDLORD WATER BASED SYSTEMS**
Water based mechanical systems shall provide;
3. a minimum of one ton of cooling per 120 square feet of leased floor area , with kitchen zoned separately from dining, which shall be available 24/7/365
4. If Landlord provides heating, Landlord shall provide a minimum of 60 BTU/hr of heating per square foot of leased floor area, which shall be available 24/7/365.

**REFRIGERATION PIPING REQUIREMENTS**
Tenant's refrigeration systems shall require;
1. space on the roof for refrigeration units.
2. a dedicated, fire rated chase to the roof with a clear 12" square opening to the roof for refrigeration piping. Chase shall have rated access panels on each floor (max 20 feet apart) for service.

**HEAT EXHAUST**

Heat exhaust shall be via;

    2. in a multi-story building, a dedicated, fire rated chase to the roof with an 18"x18" welded, stainless steel duct for Tenant's heat exhaust.

## ELECTRICAL SERVICE

Electric service size shall be;

    5. for a 3,000 S.F. space utilizing electric heat and all electric equipment;
        a. if at 480 V, 400 Amp minimum service size.
        b. if at 208 V, 800 Amp minimum service size.
    6. for a 900 S.F. space utilizing electric heat and all electric equipment;
        a. if at 480 V, 200 Amp minimum service size.
        b. if at 208 V, 400 Amp minimum service size.
    7. made available by the Landlord in the required size and voltage.
    8. confirmed by the Tenant's engineer.

## FIRE ALARM

Fire alarm service shall be;

    3. coordinated by the Tenant's engineer. Tenant's engineer shall verify device compatibility and specify required components.
    4. active when Landlord approved fire alarm vendor completes final tie in to Landlord's panel.

## TELEPHONE

Telephone service shall be;

    2. a minimum dedicated 2" diameter conduit with pull strings.

## TESTS AND LANDLORD CERTIFICATIONS REQUIRED BY TENANT

    5. Hazardous material abatement reports and certifications
    6. Proof of zoning compliance for tenant's use including;
        a. Zoning approval documents
        b. Previous certifications of occupancy
    7. Report of the moisture content of new concrete floor slabs
    8. Documentation of previous extermination treatments or citations.

## INFORMATION REQUIRED BY THE TENANT

    7. Landlord site/space development criteria.
    8. As built documents in either electronic or paper form. Documents should provide information relative to all aspects of the leased premises' construction. (I.E. Architectural, structural, mechanical, electrical, plumbing, fire protection and alarm systems) in addition to that of the leased premises' adjacent, above and below the tenant's leased premises.
    9. Disclosures as to the presence of structural floor systems, underground utilities and public transit tunnels.
    10. Requirements or regulations requiring off / after hour work or loading.
    11. Designated
        a. Landlord representative for design and construction
        b. loading zones and times

    c. approved dumpster locations
    d. Union or open shop labor requirements
12. Acknowledgement that the Tenant's drawings have been reviewed and approved by a designated agent qualified to perform a review for compliance with the Landlord's design, construction and lease criteria.

EXHIBIT C-2

DELIVERY OF POSSESSION

Project Name: _____

Date Possession Tendered:

_____

Tenant:  ABP Corporation

Landlord:

_____

Premises Address:

_____

Square Footage:

_____

Landlord and Tenant acknowledge and agree that

☐     Landlord's Work is complete and accepted by Tenant as of the delivery date
       noted above, subject to the terms and conditions of the Lease regarding latent
       defects and completion of punchlist items.

☐     Although the items of Landlord's Work indicated below are not complete, Tenant
       hereby accepts possession of the Premises as of the delivery date noted above
       and elects to complete the unfinished items at Landlord's expense, subject to the
       terms and conditions of the Lease.

☐     Tenant does not accept possession of the Premises because the items of
       Landlord's Work indicated below are not complete.  However, Tenant, at its
       option, may enter the Premises to begin performing Tenant's improvements in
       accordance with the Lease.

☐     Tenant hereby refuses possession of the Premises because the items of
       Landlord's Work indicated below are not complete.

**Incomplete items of Landlord's Work:**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

[Attach additional pages if needed]

From and after the date hereof, all notices should be delivered to Tenant at the address set forth in the Lease.

**Landlord:**                                                   **Tenant:**

_____

_____

Print Name: _____                Print Name:

_____

Title: _____                Title:  Construction Manager
Date: _____                Date:

_____

EXHIBIT C-3

DEMOLITION WORK

2/24/20112:22 PM



**ENCORE Construction, Inc.**
Retail • Restaurant • Interiors

2014 Renard Court
Suite J
Annapolis, MD 21401

Tel | 410-573-5050
Fax | 410-573-5070

Joe McCafferty
2014 Renard Court
Annapolis MD 21401
jmccafferty@encoreconstruction.net

Au Bon Pain - UMMC
Green St.
Baltimore, MD
**Bid date**          2/24/2011
**ENCORE Job #**
**Plans Dated:**      None
**Addendums:**

Demolition of existing Donna's Café        **USF**          Approx RSF

| Trade Description | Subcontractor | Quantity | Item | Cost | | Totals |
|---|---|---|---|---|---|---|
| **DIVISION I General Requirements** | | | | | | |
| Supervision | | 1.00 | LUMP SUM | $ | 3,440.00 | $ 3,440.00 |
| General Conditions | | 1.00 | LUMP SUM | $ | 695.00 | $ 695.00 |
| Final Cleanup | | 1.00 | LUMP SUM | $ | - | $ - |
| | | | | | | $ 4,135.00 |
| **DIVISION II Site work** | | | | | | |
| INTERIOR DEMOLITION - 2051 | *INCLUDED* | | | | | $ 9,350.00 |
| Remove existing drywall partition doors and frames per plans | | 1.00 | LUMP SUM | $ | 9,350.00 | 9,350.00 |
| Demo existing storefront gates complete | | | | | | |
| Remove existing ceiling tile and grid | | | | | | |
| Remove existing millwork and fixtures | | | | | | |
| Provide dump trucks for trash removal | | | | | | |
| *ALTERNATE:* | | | | $ | - | |
| **DIVISION III Concrete** | | | | | | |
| CONCRETE/SLAB - 3001 | *EXCLUDED* | | | | | $ - |
| | | - | LUMP SUM | $ | - | $ - |
| *ALTERNATE:* | | | | $ | - | |
| **DIVISION IV Masonry** | | | | | | |
| MASONRY - 4200 | *EXCLUDED* | | | | | $ - |
| | | - | LUMP SUM | $ | - | $ - |
| *ALTERNATE:* | | | | $ | - | |
| **DIVISION V Metals** | | | | | | |
| STRUCTURAL STEEL - 5100 | *EXCLUDED* | | | | | $ - |
| | | - | LUMP SUM | $ | - | $ - |
| *ALTERNATE:* | | | | $ | - | |
| METAL FABRICATIONS - 5500 | *EXCLUDED* | | | | | $ - |
| | | - | LUMP SUM | $ | - | $ - |
| *ALTERNATE:* | | | | $ | - | |



**2014 Renard Court**
Suite J
Annapolis, MD 21401

Tel | 410-573-5050
Fax | 410-573-5070

2/24/20112:22 PM

## DIVISION VI Wood & Plastics

| ROUGH CARPENTRY - 6132 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| MILLWORK - 6400 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

## DIVISION VII Thermal/Moisture Protect

| INSULATION - 7200 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| ROOFING - 7510 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

## DIVISION VIII Doors & Windows

| DOORS, FRAMES & HARDWARE - 8200 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| GLASS/GLAZING - 8800 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

## DIVISION IX Finishes

| DRYWALL - 9250 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| FLOORING - 9300 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| ACOUSTICAL - 9500 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

| WALL FINISHES - 9900 | EXCLUDED | | $ | - |
|---|---|---|---|---|
| | | - LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | $ - | |

2/24/20112:22 PM



**ENCORE**
**Construction, Inc.**
Retail • Restaurant • Interiors

2014 Renard Court
Suite J
Annapolis, MD 21401

Tel  I 410-573-5050
Fax I 410-573-5070

**DIVISION X Specialties**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FIRE EXTINGUISHER - 10522 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |
| TOILET ACCESSORIES- 10160 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |

**DIVISION XI Equipment**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| APPLIANCES/EQUIPMENT - 11450 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |

**DIVISION XII Furnishings**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| WINDOW COVERINGS - 12500 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |

**DIVISION XV Mechanical**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FIRE SPRINKLER - 15300 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |
| PLUMBING - 15400 | INCLUDED | | | | | $ | 1,200.00 |
| Disconnect and make safe all existing equipment for demolition. Cap all piping not to be reused | | | 1.00 | LUMP SUM | $ 1,200.00 | $ | 1,200.00 |
| *ALTERNATE: | | | | | $ - | | |
| HVAC - 15500 | INCLUDED | | | | | $ | 800.00 |
| Disconnect and make safe for demolition. | | | 1.00 | LUMP SUM | $ 800.00 | $ | 800.00 |
| *ALTERNATE: | | | | | $ - | | |

**DIVISION XVI Electrical**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ELECTRICAL - 16001 | INCLUDED | | | | | $ | 1,900.00 |
| Disconnect and make safe for demolition.  Pull circuits back to panel. | | | 1.00 | LUMP SUM | $ 1,900.00 | $ | 1,900.00 |
| *ALTERNATE: | | | | | $ - | | |
| FIRE LIFE SAFETY - 16600 | EXCLUDED | | | | | $ | - |
| | | | - | LUMP SUM | $ - | $ | - |
| *ALTERNATE: | | | | | $ - | | |

**COST SUMMARY**

| | | |
|---|---|---|
| COST OF WORK | $ | 17,385.00 |
| FEE & PROFIT | $ | 1,700.00 |

**TOTAL BUDGET** | $ | 19,085.00 |

2/24/20112:21 PM



**ENCORE**
**Construction, Inc.**
Retail • Restaurant • Interiors

2014 Renard Court
Suite J
Annapolis, MD 21401

Tel | 410-573-5050
Fax | 410-573-5070

Joe McCafferty
2014 Renard Court
Annapolis MD 21401
jmccafferty@encoreconstruction.net

Au Bon Pain – Paca Pratt Bldg
Green St.
Baltimore, MD
**Bid date**          2/24/2011
**ENCORE Job #**
**Plans Dated:**      None
**Addendums:**

| Demolition of existing Donna's Café in Paca Pratt Bldg | | USF | | Approx RSF | |
|---|---|---|---|---|---|

| Trade Description | Subcontractor | Quantity | Item | Cost | Totals |
|---|---|---|---|---|---|
| **DIVISION I General Requirements** | | | | | |
| Supervision | | 1.00 | LUMP SUM | $ 3,440.00 | $ 3,440.00 |
| General Conditions | | 1.00 | LUMP SUM | $ 695.00 | $ 695.00 |
| Final Cleanup | | 1.00 | LUMP SUM | $ - | $ - |
| | | | | | $ 4,135.00 |
| **DIVISION II Site work** | | | | | |
| INTERIOR DEMOLITION - 2051 | *INCLUDED* | | | | $ 3,950.00 |
| Remove existing ceiling tile  & grid, lighting to remain. | | 1.00 | LUMP SUM | $ 3,950.00 | $ 3,950.00 |
| Remove existing drywall partitions, doors & frames per drawings | | | | | |
| Remove existing millwork and equipment not being reused | | | | | |
| Remove existing ductwork not being reused | | | | | |
| Dumpsters for trash removal | | | | | |
| *ALTERNATE:* | | | | $ - | |
| **DIVISION III Concrete** | | | | | |
| CONCRETE/SLAB - 3001 | *EXCLUDED* | | | | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE:* | | | | $ - | |
| **DIVISION IV Masonry** | | | | | |
| MASONRY - 4200 | *EXCLUDED* | | | | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE:* | | | | $ - | |
| **DIVISION V Metals** | | | | | |
| STRUCTURAL STEEL - 5100 | *EXCLUDED* | | | | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE:* | | | | $ - | |
| METAL FABRICATIONS - 5500 | *EXCLUDED* | | | | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE:* | | | | $ - | |

2/24/20112:21 PM



**ENCORE**
**Construction, Inc.**
*Retail • Restaurant • Interiors*

2014 Renard Court
Suite J
Annapolis, MD 21401

Tel | 410-573-5050
Fax | 410-573-5070

### DIVISION VI Wood & Plastics

| | | | | | |
|---|---|---|---|---|---|
| ROUGH CARPENTRY - 6132 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| MILLWORK - 6400 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |

### DIVISION VII Thermal/Moisture Protect

| | | | | | |
|---|---|---|---|---|---|
| INSULATION - 7200 | EXCLUDED | | | $ - | $ - |
| | | - | | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| ROOFING - 7510 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |

### DIVISION VIII Doors & Windows

| | | | | | |
|---|---|---|---|---|---|
| DOORS, FRAMES & HARDWARE - 8200 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| GLASS/GLAZING - 8800 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |

### DIVISION IX Finishes

| | | | | | |
|---|---|---|---|---|---|
| DRYWALL - 9250 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| FLOORING - 9300 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| ACOUSTICAL - 9500 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |
| WALL FINISHES - 9900 | EXCLUDED | | | $ - | $ - |
| | | - | LUMP SUM | $ - | $ - |
| *ALTERNATE: | | | | $ - | |



2014 Renard Court
Suite J
Annapolis, MD 21401

Tel I 410-573-5050
Fax I 410-573-5070

2/24/20112:21 PM

**DIVISION X Specialties**

| FIRE EXTINGUISHER - 10522 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | LUMP SUM | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

| TOILET ACCESSORIES- 10160 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | LUMP SUM | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

**DIVISION XI Equipment**

| APPLIANCES/EQUIPMENT - 11450 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | LUMP SUM | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

**DIVISION XII Furnishings**

| WINDOW COVERINGS - 12500 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

**DIVISION XV Mechanical**

| FIRE SPRINKLER - 15300 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | LUMP SUM | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

| PLUMBING - 15400 | INCLUDED | | | | $ | | $ | 800.00 |
|---|---|---|---|---|---|---|---|---|
| Disconnect and make safe all existing equipment for demolition. Cap all piping not to be reused | | | 1.00 | LUMP SUM | $ | 800.00 | $ | 800.00 |
| *ALTERNATE: | | | | | $ | - | | |

| HVAC - 15500 | INCLUDED | | | | $ | | $ | 800.00 |
|---|---|---|---|---|---|---|---|---|
| Disconnect and make safe for demolition. | | | 1.00 | LUMP SUM | $ | 800.00 | $ | 800.00 |
| *ALTERNATE: | | | | | $ | - | | |

**DIVISION XVI Electrical**

| ELECTRICAL - 16001 | INCLUDED | | | | $ | | $ | 1,500.00 |
|---|---|---|---|---|---|---|---|---|
| Disconnect and make safe for demolition. Pull circuits back to panel. | | | 1.00 | LUMP SUM | $ | 1,500.00 | $ | 1,500.00 |
| *ALTERNATE: | | | | | $ | - | | |

| FIRE LIFE SAFETY - 16600 | EXCLUDED | | | | $ | - | $ | - |
|---|---|---|---|---|---|---|---|---|
| | | | - | LUMP SUM | $ | - | $ | - |
| *ALTERNATE: | | | | | $ | - | | |

**COST SUMMARY**

| COST OF WORK | $ | 11,185.00 |
|---|---|---|
| FEE & PROFIT | $ | 1,000.00 |

| **TOTAL BUDGET** | **$** | **12,185.00** |
|---|---|---|

EXHIBIT C-4

PROPERTY REMAINING IN PACA PRATT

| UMMS Owned | | Description |
|---|---|---|
| 3 bay sink | sink, valves,hand held spray,wall mtd shelfs(2), | kitchen-dish wash a |
| mop sink | with faucets and wall racks and accessories | kitchen-dish wash a |
| hand sink | as is wall mtd next to 3 bay sink | kitchen-dish wash a |
| hand sink by 1 bay sink | as is | prep line |
| hot water heaters | as is | dock/receiving area |
| water filter | as is wall mtd next to 3 bay sink | kitchen-dish wash a |
| 1 bay sink against wall | as is | prep line |

EXHIBIT D

CURRENT EXCLUSIVE USES

There are currently no "exclusive use" considerations for the Tenant to recognize when deciding to offer items to its customers. However, the Tenant agrees to consult the Landlord before offering any additional items for sale pursuant to (g) of Section 7.1 of the Lease.

EXHIBIT E

PATIO AREA

